VORYS SATER SEYMOUR AND PEASE LLP
Cory D. Catignani (Bar No. 332551)
cdcatignani@vorys.com
4675 MacArthur Court, Suite 700
Newport Beach, CA 92660
Telephone: (949) 526-7900
Facsimile: (949) 526-7901

Attorneys for Defendants
STERLING JEWELERS INC. and
SIGNET JEWELERS LTD

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMY MCCORMACK, as an individual and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>STERLING JEWELERS INC., a corporation; SIGNET JEWELERS LTD., a corporation; and DOES 1 through 50,<br><br>Defendants. | Case No. **'22CV525 AJB BGS**<br><br>**DEFENDANTS STERLING JEWELERS INC. AND SIGNET JEWELERS LTD'S NOTICE OF REMOVAL**<br><br>Action Filed:   March 4, 2022<br>Trial Date:     None Set<br>Removal Date:  April 15, 2022 |

TO THE CLERK OF THE ABOVE-ENTITLED COURT, AND TO AMY MCCORMACK AND HER ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Defendants Sterling Jewelers Inc. ("Sterling") and Signet Jewelers LTD ("Signet") (collectively, "Defendants") hereby remove the above-captioned action from the Superior Court for the State of California, County of San Diego, to the United States District Court for the Southern District of California, pursuant to 28 U.S.C. §§ 1332(d) and 1446.

As required by 28 U.S.C. § 1446(d), Defendants will file in the Superior Court and serve upon Plaintiff and her counsel of record a Notice to State Court of Removal of Civil Action to Federal Court (with these removal papers attached).

In support of this Notice of Removal, Defendants state the following:

## PROCEDURAL HISTORY

1. Plaintiff Amy McCormack ("Plaintiff") filed her Complaint, captioned *Amy McCormack, as an individual and on behalf of all others similarly situated v. Sterling Jewelers Inc., a corporation; Signet Jewelers LTD, a corporation; and Does 1 through 50*, Case No. 37202200008433CUOECTL in the Superior Court for the State of California for the County of San Diego (the "State Court Action") on March 4, 2022.  A true and correct copy of the Complaint, including the Proof of Service, is attached as **Exhibit 1** ("Complaint").

2. The Complaint was served on Defendants on March 17, 2022.  *See* **Exhibit 1.**

3. Defendants filed an answer to Plaintiff's Complaint on April 13, 2022 ("Answer").  A true and correct copy of Defendants' Answer is attached hereto as **Exhibit 2**.

## STATEMENT OF JURISDICTION

4. This Court has original jurisdiction over this action under the Class Action Fairness Act of 2005 ("CAFA").  *See* 28 U.S.C. § 1332(d).  In relevant part, CAFA grants district courts original jurisdiction over civil class actions filed under federal or state law in which any member of a class of 100 or more putative class members is a citizen of a state different from any defendant and the amount in controversy for the putative class members in the aggregate exceeds $5,000,000, exclusive of interest and costs.  CAFA authorizes removal of such actions pursuant to 28 U.S.C. § 1446.  As set forth below, this case meets all of CAFA's requirements for removal and is timely and properly removed by the filing of this Notice of Removal.

5. The Act applies to actions that were "commenced" on or after February 18, 2005.  Because Plaintiff filed the State Court Action on March 4, 2022, it was "commenced" on or after February 18, 2005, and removal is proper under CAFA.

**TIMELINESS OF REMOVAL**

6. Pursuant to 28 U.S.C. § 1446(b), Defendants filed this removal within 30 days after receipt of service of the Complaint and Summons (March 17, 2022). *See* **Exhibit 1.**

**VENUE**

7. Plaintiff originally filed this action in the Superior Court for the State of California, County of San Diego.  Venue is thus proper in this district, pursuant to 28 U.S.C. § 1441(a), because it encompasses the county in which this action is pending.

**PROCEDURAL REQUIREMENTS**

8. Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders served upon Defendants are attached to this Notice of Removal.[1]  Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for Plaintiff and a copy is being filed with the Clerk of the Superior Court for the State of California, County of San Diego.

**DEFENSES**

The removal of this action to the Northern District of California does not waive Defendants' ability to assert any defense to this action. **REMOVAL UNDER THE CLASS ACTION FAIRNESS ACT**

**A. Plaintiff's Action is Pled as a Class Action**

9. Under CAFA, "'class action' means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by one or more representative persons as a class action."  28 U.S.C. § 1332(d)(1)(B).

---

[1] In conformity with the requirement of 28 U.S.C. § 1446(a), that copies of all process, pleadings and orders served upon Defendants in the State Court Action be included with this notice of removal, the State Court Action case file, other than those documents already attached as Exhibits 1 and 2, is attached as **Exhibit 3**.

10. The State Court Action has been styled as a class action, pursuant to California Code of Civil Procedure section 382.  *See* Complaint, ¶ 30.  Cal. Code of Civ. Pro. § 382 authorizes an action to be brought by one or more representative persons as a class action.  *See* Cal. Code of Civ. Pro. § 382.

**B. The Proposed Class Contains at Least 100 Members**

11. Pursuant to 28 U.S.C. § 1332(d)(5)(B), district courts will have original jurisdiction over a class action case under CAFA if the number of members of the putative plaintiff class is not less than 100.

12. This requirement is met here.  Plaintiff's Complaint proposes several different classes, including:

 a. "All Class Members who worked for Sterling Jewelers Inc. at any time from March 4, 2018, through the date of trial in this action . . . and were not paid all regular, overtime, or minimum wages for all hours worked each pay period ('Unpaid Wage Class')"

 b. "All Class Members who during the Class Period: [1] worked for Sterling Jewelers Inc. [2] worked shifts of five hours or more without a duty-free meal period of at least 30 minutes or shifts of 10 or more hours without a duty-free second 30-minute meal period, and [3] were not paid one hour of meal period premium pay at the regular rate of compensation for each of those days ('Meal Period Class')."

 c. "All Class Members who during the Class Period: [1] worked for Sterling Jewelers Inc. and/or Signet Jewelers Ltd., [2] were paid a meal period premium, and [3] who were paid commission, bonuses, incentives, or other non-discretionary remuneration in the same pay period in which they received a meal period premium ('Meal Period Premium Class')."

d. "All Class Members who during the Class Period: [1] worked for Sterling Jewelers Inc., [2] worked shifts of four hours or major fraction thereof without being authorized or permitted an uninterrupted rest period of at least 10 minutes, and [3] were not paid one hour of rest period premium pay at the regular rate of compensation for each of those days ('Rest Period Class')."

e. "All Class Members who during the Class Period [1] worked for Sterling Jewelers Inc. and/or Signet Jewelers Ltd., [2] were paid a rest period premium, and [3] who were paid commission, bonuses, incentives, or other non-discretionary remuneration in the same pay period in which they received a rest period premium ('Rest Period Premium Class')."

f. "All Class Members who during the Class Period: [1] worked for Sterling Jewelers Inc. and/or Signet Jewelers Ltd., [2] were paid for sick leave or Covid-19 supplemental sick leave, and [3] were not paid for such sick leave at a rate authorized by one of the methods provided in the California Labor Code ('Sick Leave Underpayment Class')."

g. "All Class Members who during the Class Period: [1] worked for Sterling Jewelers Inc., [2] used their personal devices for required work-related purposes, and [3] were not fully reimbursed for the use of their personal devices ('Reimbursement Class')."

h. "All Class Members who: [1] belong to the Meal Period, Meal Period Premium, Rest Period, Rest Period Premium, Sick Leave Underpayment, and Unpaid Wage Classes, respectively, and [2] who separated from employment with Sterling Jewelers Inc. and/or Signet Jewelers Ltd. at any time from March 4, 2019 through the time of trial in this action ('Waiting Time Class')."

i.  "All Class Members who: [1] belong to the Unpaid Wage, Meal Period, Meal Period Premium, Rest Period, Rest Period Premium, and Sick Leave Underpayment Classes, and [2] who received a wage statement from Sterling Jewelers Inc. and/or Signet Jewelers Ltd. at any time from March 4, 2021 through the time of trial in this action ('Wage Statement Class')."

j.  "All Class Members who belong to Classes (a)-(i) above and were subject to Defendants unlawful or unfair business acts or practices during the Class Period ('UCL Class')."

Complaint, ¶ 30(a)-(j).

13. Plaintiff herself alleges that there are more than 100 class members.  Complaint, ¶ 32.  While Signet does not employ any non-exempt employees in California, Sterling and Zale Delaware, Inc. ("Zale"), both subsidiaries of Signet, operate a number of banners that employ non-exempt employees in the state of California.  *See* Declaration of Victoria Ortega ("Ortega Decl."), attached hereto as **Exhibit 4**, at ¶¶ 2-3.

14. There are approximately 5,240 potential class members (all current and former non-exempt California employees ("team members") working at one of the five Sterling or Zale banners (collectively "All Banners") during the Relevant Period. *See* Declaration of Rebekah Smith ("Smith Decl."), attached hereto as **Exhibit 5**, at ¶ 40.  Thus, the size of the proposed class is sufficient to meet CAFA's requirement for removal to federal court.

**C. There is Diversity Between at Least One Putative Class Member and One Defendant**

15. CAFA's minimal diversity requirement is satisfied, *inter alia*, when "any member of a class of plaintiffs is a citizen of a State different from any defendant."  28 U.S.C. §§ 1332(d)(2)(A); 1453(b).  Minimal diversity of citizenship exists here because of Plaintiff and Sterling.

16. Allegations of residency in a state court complaint can create a rebuttable presumption of domicile supporting diversity of citizenship. *Lew v. Moss*, 797 F.2d 747, 750-51 (9th Cir. 1986*); see also State Farm Mut. Auto. Ins. Co. v. Dyer*, 19 F.3d 514, 519-20 (10th Cir. 1994) (allegation by party in state court complaint of residency "created a presumption of continuing residence in [state] and put the burden of coming forward with contrary evidence on the party seeking to prove otherwise"); *Smith v. Simmons*, 2008 U.S. Dist. LEXIS 21162, at *22 (E.D. Cal. 2008) (place of residence provides "prima facie" case of domicile).

17. Plaintiff is a resident of the State of California and alleges that she worked for Defendants in the State of California. Complaint, ¶ 8. *See Lew* at 750 (holding plaintiff's place of employment can establish domicile for the purpose of diversity jurisdiction). Therefore, Plaintiff is a citizen of the State of California.

18. Conversely, Sterling is not a citizen of California. For diversity purposes, a corporation is deemed a citizen of its state of incorporation and the state where it has its principal place of business. 28 U.S.C. § 1332(c)(1); *See also Hertz Corp. v. Friend*, 559 U.S. 77, 80 (2010) (A corporation's "principal place of business" is "the place where a corporation's officers direct, control, and coordinate the corporation's activities.").

19. Sterling is a corporation organized under the laws of the State of Delaware. Its principal place of business is in Akron, Ohio. Ortega Decl. at ¶ 4. For purposes of diversity jurisdiction, therefore, Sterling is a citizen of Delaware and Ohio.[2]

20. The presence of Doe defendants in this case has no bearing on diversity with respect to removal. *See Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 690-691 (9th Cir. 1998); *see also* 28 U.S.C. § 1441(b) ("[f]or the purposes of

---

[2] Although a single diverse defendant is sufficient to meet the threshold diversity requirement under CAFA, Signet is a public company incorporated and with its principal offices located in Bermuda, and thus is diverse for purposes of removal. *See* Ortega Decl. at ¶ 6.

removal…the citizenship of defendants sued under fictitious names shall be disregarded").

21. Accordingly, since Plaintiff is a citizen of a different state than Sterling, minimal diversity exists for federal jurisdiction under CAFA. *See* 28 U.S.C. §§ 1332(d)(2)(A).

**D. The Amount in Controversy Exceeds $5,000,000[3]**

22. This Court has jurisdiction under CAFA, which authorizes the removal of class actions in which, among the other factors mentioned above, the amount in controversy for all class members exceeds $5,000,000. *See* 28 U.S.C. § 1332(d).

23. The removal statute requires that a defendant seeking to remove a case to federal court must file a notice "containing a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a).

24. Plaintiff's Complaint is silent as to the total amount in controversy. However, Plaintiff's failure to specify the total damages or other monetary relief sought does not deprive this Court of jurisdiction. Rather, when the plaintiff fails to plead a specific amount of damages, the defendant seeking removal "must prove by a preponderance of the evidence that the amount in controversy requirement has been met." *See Rodriguez v. AT&T Mobility Servs.*, 728 F.3d 975, 977 (9th Cir. 2013) ("the proper burden of proof imposed upon a defendant to establish the amount in controversy is the preponderance of the evidence standard.").

25. This burden is not onerous and does not obligate a removing defendant to "research, state, and prove the plaintiff's claims for damages." *Korn v. Polo Ralph Lauren Corp.*, 536 F.Supp.2d 1199, 1204-1205 (E.D. Cal. 2008). Rather, "[t]he 'ultimate inquiry' is what amount is put 'in controversy' by the plaintiff's

---

[3] Defendants provide the following calculations only to demonstrate that the amount in controversy exceeds $5,000,000. Defendants make no admission of liability or damages with respect to any aspect of this case, nor do Defendants waive their right to ultimately contest the proper amount of damages due, if any, should Plaintiff prevail with any of her claims.

complaint, not what a defendant will *actually* owe." *Id.* (citing *Rippee v. Boston Mkt. Corp.*, 408 F. Supp. 2d 982, 986 (S.D. Cal. 2005)). In determining the amount in controversy for CAFA, all potential damages based on the claims in the complaint, as well as attorneys' fees, are included. *See Campbell v. Vitran Express, Inc.*, 471 Fed. App'x 646, 648 (9th Cir. 2012) (in measuring the amount in controversy, a court "must assume that the allegations of the complaint are true and assume that a jury will return a verdict for the plaintiff on all claims made in the complaint.") (quotations and citations omitted).

26. The United States Supreme Court has held that "as specified in §1446(a), a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014). Only if the plaintiff contests or the court questions the allegations of the notice of removal, is supporting evidence required. *See id.* Otherwise, "the defendant's amount-in-controversy allegation should be accepted" just as a plaintiff's amount-in-controversy allegation is accepted when a plaintiff invokes federal court jurisdiction. *Id.* at 87.

27. In establishing the amount in controversy, a removing party is entitled to make reasonable assumptions. *Ibarra v. Manheim Invs., Inc.,* 775 F.3d 1193, 1199 (9th Cir. 2015); *see also Oda v. Gucci Am.*, Inc, No. 2:14-cv-7468-SVW (JPRx) and 2:14-cv-07469-SVW (JPRx), 2015 U.S. Dist. LEXIS 1672, at *10 (C.D. Cal. 2015) ("Where, as here, a plaintiff makes generalized allegations regarding the frequency of violations, a defendant may calculate the amount in controversy based on reasonable assumptions.").

28. Moreover, Congress intended that any uncertainty of the removability of an interstate class action be resolved in favor of federal jurisdiction. *See* Senate Judiciary Committee Report, S. REP. 109-14, at 42 ("if a federal court is uncertain about whether 'all matters in controversy' in a purported class action

'do not in the aggregate exceed the sum or value of $5,000,000,' the court should err in favor of exercising jurisdiction over the case.").

29. In sum, Defendants deny the validity and merits of Plaintiff's claims, the legal theories upon which they are purportedly based, and the claims for monetary and other relief that flow from them. Nevertheless, and notwithstanding Plaintiff's failure to allege the total amount of damages claimed, the amount in controversy as alleged by Plaintiff in this case exceeds $5,000,000.

30. Plaintiff worked for Sterling under the Jared banner. Complaint, ¶ 9. Therefore, to the extent she is asserting claims against Sterling specifically (as opposed to the claims alleged against Sterling and Signet), Defendants only considered other Jared non-exempt California employees.

### 1) Failure to Pay Overtime

31. Plaintiff's second cause of action is for the alleged failure to pay overtime compensation pursuant to California Labor Code Sections 510 and 1194. Complaint, ¶¶ 44-48. She asserts this on behalf of the "Unpaid Wage Class" as defined in the Complaint. *Id.* at ¶ 45.

32. Each non-exempt employee is entitled to be paid one and one–half times her regular rate of pay for time worked in excess of eight (8) hours per workday and/or more than forty (40) hours per workweek. Cal. Lab. Code § 510.

33. Plaintiff pleads that "Defendants failed in their affirmative obligation to pay Plaintiff and the Unpaid Wage Class no less than one and one-half times their respective 'regular rate of pay' for all hours worked in excess of eight hours in one day, 40 hours in one week, or the first eight hours worked on the seventh day of work in any one workweek, and no less than twice their respective 'regular rate of pay' for all hours over 12 hours in one day and any work in excess of eight hours on any seventh day of a workweek in violation of Labor Code sections 510, 1194, and 1198 and the IWC Wage Orders." Complaint, ¶ 46. She alleges that this was the result of "Defendants' practice of requiring

employees to perform work duties during unpaid meal periods."  Complaint, ¶ 16.

34. Courts have routinely held that an assumption of one hour of unpaid overtime per week is reasonable, particularly when, as here, the complaint alleges a practice of failing to pay overtime wages. *Danielsson v. Blood Ctrs. of the Pac.*, No. 19-cv-04592-JCS, 2019 U.S. Dist. LEXIS 222539, at *21 (N.D. Cal. Dec. 30, 2019) ("Courts in this circuit have held that an hour of unpaid overtime per week is a reasonable estimate when the complaint alleges a pattern and practice of failing to pay overtime wages.") (internal quotations omitted) (citing *Kastler v. Oh My Green, Inc.*, No. 19-cv-02411-HSG, 2019 U.S. Dist. LEXIS 185484, at *12 (N.D. Cal. Oct. 25, 2019) and *Arreola v. Finish Line*, No. 14-CV-03339-LHK, 2014 U.S. Dist. LEXIS 170464, at *7 (N.D. Cal. Dec. 9, 2014)) ("Where, as here, a proposed class includes all employees during the class period, and the plaintiff pleads that an employer has a regular or consistent practice of violating employment laws that harmed each class member, such an allegation supports a defendant's assumptions that every employee experienced at least one violation once per week.")).

35. The average hourly rate of non-exempt Jared employees in California for the period of time from March 4, 2018 to the present is $18.74.  Smith Decl. ¶ 35. The overtime rate for this one hour of pay would therefore be $28.11 (1.5 x $18.74).

36. During the Class Period, there were 25,913 weeks where a Jared employee was eligible for overtime pay because they worked more than eight hours in one day, forty hours in one week, or seven consecutive days ("Overtime Eligible Weeks"). *See* Smith Decl. at ¶ 29.

37. As set forth above, Plaintiff alleges that Defendants maintained a policy and practice of failing to properly pay overtime.  As such, Defendants will

1   conservatively assume 1 hour of unpaid overtime per week during Overtime

2   Eligible Weeks for Jared employees.

3   38. Multiplying the assumed hours of unpaid overtime by the average hourly

4   overtime rate for the putative class, this  cause of action puts **$728,414.43** in

5   controversy (25,913 x $28.11).

6   **2)   Failure to Provide Meal Periods and Permit Rest Breaks**

7   39. In the third and fourth causes of action, Plaintiff alleges that she and others were

8   not given proper meal and rest breaks. Complaint, ¶¶ 49-58.  California Labor

9   Code Section 226.7(b) establishes that an employee who does not receive a

10   meal or rest period to which she is entitled shall be paid one hour of pay at her

11   regular rate of compensation as premium pay.  *See* Cal. Lab. Code 226.7(b).

12   Plaintiff asserts that she is entitled to premium pay for missed meal and rest

13   periods under Section 226.7 of the Labor Code.  Complaint at Part (D) of

14   "Prayer" Section.

15   40. Plaintiff alleges that "Defendants had a pattern and practice of failing to provide

16   timely, off-duty 30-minute meal periods…" and that "Defendants had a pattern

17   and practice of failing to authorize or *permit* ten-minute rest periods for every

18   four hours of work or major fraction thereof as required by Labor Code section

19   226.7 and section 12 of the applicable IWC Wage Order." Complaint, ¶¶ 17,

20   20.  Plaintiff further alleges that "Defendants willfully failed in their affirmative

21   obligation to consistently provide Plaintiff and the Meal Period Class

22   compliant, duty-free meal periods" and "willfully failed in their affirmative

23   obligation to consistently authorize and permit Plaintiff and the Rest Period

24   Class to receive complaint, duty-free rest periods."  Complaint, ¶¶ 51, 56.

25   41. Numerous Courts have held that assuming a 100% violation rate is permissible

26   for determining the amount in controversy when a Complaint does not contain

27   more detailed allegations that would suggest such an assumption is incorrect.

28   *See, e.g., Mejia v. DHL Express (USA), Inc*., No. 15-890-GHK (JCx), 2015 U.S.

Dist. LEXIS 67212, at *10 (C.D. Cal May 21, 2015) (using a 100% violation rate to calculate the amount in controversy where the plaintiff's complaint "does not contain any allegations that suggest a 100% violation rate is an impermissible assumption."); *Muniz v. Pilot Travel Ctrs.*, No. CIV. S-07-0325 FCD EFB, 2007 U.S. Dist. LEXIS 31515, at *12-*13 (E.D. Cal. April 30, 2007) ("[P]laintiff includes no fact-specific allegations that would result in a … violation rate that is discernibly smaller than 100% . . . . Plaintiff is the master of her claims, and if she wanted to avoid removal, she could have alleged facts specific to her claims which would narrow the scope of the putative class or the damages sought."). This is especially true here since Plaintiff has alleged that Defendants had a "pattern and practice" of not providing complaint meal and rest periods. In such situations, courts regularly find that 50% to 100% assumed violation rates are appropriate. *See Giannini v. Nw. Mut. Life Ins. Co.*, No. C 12-77 CW, 2012 U.S. Dist. LEXIS 60143, at *11 (N.D. Cal. Apr. 30, 2012) (allegations of "routine" violations supported assumption of 100% violation rate); *Elizarraz v. United Rentals, Inc.*, No. 2:18-CV-09533-ODW (JC), 2019 U.S. Dist. LEXIS 62065, at  *10-11 (C.D. Cal. Apr. 9, 2019) (finding a 50% violation rate (of every day worked) for missed meal periods and a 25% violation rate (of every day worked) for missed rest periods reasonable based on 'pattern and practice' allegations); *see also Long v. Destination Maternity Corp.*, No. 15cv2836-WQH-RBB, 2016 U.S. Dist. LEXIS 54323, at *24 (S.D. Cal. Apr. 21, 2016) (finding a violation rate of once per week for both meal periods and rest periods).

42. Nonetheless, and in spite of an allegation of consistent violations, Defendants will conservatively assume that Plaintiff alleges a missed meal period for 25% of meal-period-eligible shifts and a missed rest period for 25% of rest-period-eligible shifts.  This assumption is reasonable and more conservative than those discussed above.  It is less than the 50% or 100% violation rates that courts have

found reasonable. It is also more conservative than a once-per-week assumption that is not limited to meal or rest-period eligible shifts. Defendants' approach, conversely, only focuses on shifts that would entitle employees to meal or rest breaks and assumes a relatively low violation rate for those shifts.

43. Defendants used the average hourly rate of all Jared employees to calculate the amount these claims place into controversy. *Sanchez v. Russell Sigler, Inc.*, No. CV 15-01350-AB (PLAx), 2015 U.S. Dist. LEXIS 55667, at *11 (C.D. Cal. April 28, 2015) ("Defendant's use of an average hourly wage was proper for determining the amount in controversy."); *Coleman v. Estes Express Lines*, Inc., 730 F. Supp. 2d 1141, 1150 (C.D. Cal. 2010) ("it is preferable for defendants to calculate the average hourly wage based on the average wage of all class members." (internal citation and quotation marks omitted)).

44. The average hourly rate of non-exempt Jared employees in California for the period of time from March 4, 2018 to the present is $17.56.  Smith Decl. ¶ 25. Additionally, Jared employees worked 140,877 meal-period-eligible shifts and 152,081 rest-period-eligible shifts during that same time period.  *See* Smith Decl. ¶¶ 30, 33.

45. As specified above, for purposes of calculating the amount in controversy, Defendants assume a violation rate of 25% for both the meal- and rest-period claims.  Thus, the meal-period claim places $618,450.03 in controversy ($17.56 x 140,877 x .25) and the rest-period claim places $667,635.59 in controversy ($17.56 x 152,081 x .25).

46. In total, then, the third and fourth causes of action place **$1,286,085.62** in controversy.

### 3)  Failure to Timely Pay Wages During Employment

47. Plaintiff's fifth cause of action is for the failure to timely pay wages during employment, pursuant to California Labor Code Sections 204 and 210. Labor Code Section 204 provides that "labor performed between the 1st and 15th days,

inclusive, of any calendar month shall be paid for between the 16th and the 26th day of the month during which the labor was performed, and labor performed between the 16th and the last day, inclusive, of any calendar month, shall be paid for between the 1st and 10th day of the following month." Cal. Lab. Code § 204.

48. Plaintiff alleges that "Defendants willfully failed in their affirmative obligation to timely pay all wages and premiums earned by Plaintiff and certain Class Members twice during each calendar month on days designated in advance by the employer as regular paydays (for employees paid on a non-weekly basis) and on regularly-scheduled weekly payday weekly employees, if any, in violation of Labor Code sections 204 and 204b and the IWC Wage Orders." Complaint, ¶ 61.

49. Plaintiff asserts this claim on behalf of employees at All Banners for the period beginning one year prior to the filing of the Complaint.  Complaint, ¶ 60.

50. This claim is derivative of Plaintiff's other alleged Labor Code Violations. Specifically, Plaintiff alleges that "Because Defendants did not pay Plaintiff and the Class for all wages/premiums owed each pay period [during] their employment (*i.e.*, overtime, sick leave pay, supplemental sick leave pay, meal and rest premiums), Defendants failed to timely pay all wages owed on time each pay day…."  Complaint, ¶ 25.

51. Plaintiffs alleges that the penalties for not complying with Labor Code Section 204 are $100 for each initial violation for each putative class member and $200 for each subsequent violation for each putative class member. Complaint, ¶ 62; Cal. Lab. Code § 210.

52. During the period beginning one year prior to the filing of the Complaint, there were 37,671 pay periods for 2,499 different non-exempt employees in California working for All Banners.  Smith Decl. ¶¶ 23, 41.

53. Since this claim is derivative of several other underling Labor Code claims that were alleged to occur "consistently" and/or as a "pattern and practice" (Complaint, ¶¶ 17, 20, 52, 57), it is reasonable to assume a 100% violation rate. *Wheatley v. MasterBrand Cabinets, LLC*, No. EDCV 18-2127 JGB (SPx), 2019 U.S. Dist. LEXIS 26201, at *19-20 (C.D. Cal. Feb. 19, 2019).

54. Moreover, Plaintiff alleges that ***all*** meal period premiums, sick pay, and COVID-19 Supplemental Sick Leave were paid at the incorrect rate in weeks where putative class members had "remuneration in addition to their respective base hourly rate for hours worked (*e.g.*, bonuses, commissions, etc.)." Complaint, ¶¶ 22-23, 52, 72-73. There were 10,879 pay period where a meal-period premium was paid to an employee in a week where the employee also received other remuneration above their base rate of pay, 3,345 pay periods where an employee used sick hours during a week where the employee also received other remuneration above their base rate of pay, and 501 pay periods where an employee used supplemental COVID-19 sick leave during a week where the employee also received other remuneration above their base rate of pay, for a total of 14,725 pay periods, or 39.08% of all pay periods during the year preceding the Complaint. *See* Smith Decl., ¶¶ 31, 34, 36.

55. Nonetheless, Defendants will conservatively use a 25% violation rate, meaning that 9,417 pay periods would contain a timely pay violation for purposes of this assumption (37,671 x .25, rounded down).

56. Thus, the proper measure of damages is $100 to each class member for the first violation they experienced, resulting in $249,900.00 in penalties for first statements ($100 x 2,499 employees). The remaining 6,918 pay periods would allegedly represent subsequent violations paid at $200 per violation, for a total of $1,383,600.00 in penalties for subsequent violations ($200 x 6,918 pay periods). Thus, in total, this claim places $**1,633,500.00** in controversy ($249,900 + $1,383,600).

### 4)  Failure to Provide Accurate Wage Statements

57. Plaintiff's sixth cause of action alleges that Defendants failed to include all required information on the wage statements it provided to non-exempt employees working for All Banners in California and thus failed to provide accurate wage statements in violation of California law.  Complaint, ¶ 65.

58. Specifically, Plaintiff alleges, "Defendants knowingly and intentionally failed in their affirmative obligation provide [sic] accurate itemized wage statements to Plaintiff and the Wage Statement Class in violation of Labor Code section 226(a)." *Id.*

59. California Labor Code Section 226(e) requires an employer to pay fifty dollars ($50.00) for the first pay period where a violation occurred and one-hundred dollars ($100.00) per employee for each violation in subsequent pay periods. Claims have a statute of limitations of one year. Cal. Lab. Code §§ 226(e), 340.

60. Wage-statement claims are typically derivative of other alleged Labor Code violations, as they are here.  This Court has held that a 100% violation rate is reasonable when a plaintiff "provides no evidence . . . that there were ever any wage statements that included the requisite 'accurate itemization' of overtime, missed meal breaks, and rest breaks." *Ramirez v. Caefusion Res., LLC*, No. 18-cv-2852-BEN-MSB, 2019 U.S. Dist. LEXIS 112995, at *11 (S.D. Cal. Jul. 1, 2019).   Here, Plaintiff offers the additional argument that Defendants incorrectly calculated the regular rate of pay used to pay out meal- and rest-break premiums and sick-leave benefits, meaning that she is alleging that Defendants paid meal- and rest-break premiums and sick pay inaccurately even in the instances where such payments were made. *See* Complaint, ¶¶ 19, 21-23. She also alleges that Defendants' "pattern and practice" was to fail to authorize or permit rest periods and to "consistently provide timely, off-duty 30-minute meal periods."  Complaint, ¶¶ 17, 20.

61. Plaintiff claims that these underlying alleged Labor Code violations, resulted in at least forth different wage statement inaccuracies.  *See* Complaint, ¶¶ 26, 66 (alleging failure to state gross wages earned, failure to state net wages earned, failure to state all applicable hourly rates, and inaccurate listing of total hours worked because of other alleged Labor Code violations).  If any one of these listed inaccuracies were shown on a given wage statement, Plaintiff claims a wage-statement violation would be present.  In these circumstances, other courts have also held that a "Defendant may reasonably assume every wage statement contained at least one inaccuracy." *Wheatley*, 2019 U.S. Dist. LEXIS 26201, at *20.  The reasonableness of assuming at least one inaccuracy on every wage statement is particularly strong when the complaint, like the Complaint here, alleges a lengthy list of potential violations. *Mejia*, 2015 U.S. Dist. LEXIS 67212, at *12-14.

62. Thus, it would be proper to add penalties to each wage statement provided in the relevant period.  Nonetheless, to be conservative, Defendants assume that only 50% of wage statements contained at least one inaccuracy.

63. During the period beginning one year prior to the filing of the Complaint, there were 37,671 wage statements issued to 2,499 different non-exempt employees in California working at All Banners.  Smith Decl. ¶¶ 23, 41.

64. Thus, the proper measure of damages is $50 to each class member for the first violation they experienced, resulting in $124,950.00 in penalties for first statements ($50 x 2,499 class members). The remaining 16,336 wage statements, then, would presumably represent second violations paid at $100 per violation, for a total of $1,633,600.00 in penalties for subsequent violations ($100 x 6,918 wage statements).  Thus, in total, this claim places $**1,758,550.00** in controversy ($124,950 + $1,633,600).

### 5)  Failure to Timely Pay Wages Due at Termination

65. Plaintiff's eighth cause of action is for the failure to timely pay wages upon separation, pursuant to California Labor Code Sections 201, *et al*.   Each employee is entitled to be paid her normal wages for every day the wages are late, up to a 30-day maximum.  Cal. Lab. Code § 203.

66. Again, this claim appears to be derivative of Plaintiff's myriad other claims.  As discussed throughout, Plaintiff alleges that Defendants regularly failed to calculate the regular rate of pay, had a pattern and practice of denying meal and rest periods, and failed to pay all overtime wages, among other violations.  Given the extent of these claims and the lack of language limiting the claims to a smaller subset of employees, it is reasonable for Defendants to assume that Plaintiff alleges that all former employees were owed some wages on termination.  *See e.g. Cavada v. Inter-Continental Hotels Grp., Inc.*, No. 19cv1675-GPC(BLM), 2019 U.S. Dist. LEXIS 190302, at * (S.D. Cal. Nov. 1, 2019) ("Because waiting time penalties are also based on the one missed meal and one missed rest breaks, a 100% violation rate . . . is based on a reasonable assumption"); *Marquez v. Southwire Co., LLC*, No. EDCV 21-252 JGB (SPx), 2021 U.S. Dist. LEXIS 97011, at *17-*18 (C.D. Cal. May 21, 2021) (citing *Noriesta v. Konica Minolta Bus. Solutions U.S.A., Inc.*, No. ED CV 19-0839-DOC (SPx), 2019 U.S. Dist. LEXIS 227644, at *19 (C.D. Cal. June 21, 2019)) (holding that if "Defendant had a 'pattern and practice' of refusing to grant meal and rest breaks or pay class members for all hours worked, then it is likely that all or nearly all class members experienced [waiting time] violations").

67. This assumption is logical because recovery of waiting time penalties does not hinge on the number of violations committed.  Defendants "need only have caused and failed to remedy a single violation per employee for waiting time penalties to apply." *Noriesta*, 2019 U.S. Dist. LEXIS 227644, at *19; *see also* Cal. Lab. Code § 203(b).

68. Thus, courts have routinely held that a 100% violation rate using the full 30-day period is appropriate. *See, e.g., Altamirano v. Shaw Indus.*, No. C-13-0939 EMC, 2013 U.S. Dist. LEXIS 84236, at *34 (N.D. Cal. 2013) ("[A]warding penalties for the entire 30 pay [*sic*] period is reasonable."); *see also Rahmatullah v. Charter Communs.*, No. EDCV 20-354 PSG (SPx), 2020 U.S. Dist. LEXIS 127235, at *12 (C.D. Cal. July 15, 2020) ("The thirty-day maximum is supported by Plaintiff's complaint because Plaintiff seeks the maximum penalty, and Plaintiff's complaint contains broad and general allegations and does not contain limiting language.").

69. Nonetheless, Defendants conservatively assume a 75% violation rate, which is reasonable given that Plaintiff repeatedly claims that the violations alleged are the result of Defendants' regular practices and that Plaintiff asserts several claims against Defendants. *See, e.g.,* Complaint ¶¶ 17 (alleging a "pattern and practice of failing to consistently provide timely, off-duty 30-minute meal periods to certain Class Members"), 19 (alleging failure to factor in bonuses, commissions, and incentives in calculating the meal-period penalty paid "[w]hen Defendants did not provide compliant meal periods), 20 (alleging a "pattern and practice of failing to authorize or *permit* ten-minute rest periods for every four hours of work or major fraction thereof"). Thus, an assumption that 75% of employees who separated their employment in the three-year preceding the filing of this lawsuit experienced at least one violation during the course of their employment is reasonable.

70. To calculate penalties owed, courts have held that it is reasonable to assume an eight-hour workday. *See Altamirano*, 2013 U.S. Dist. LEXIS 84236, at *34; *see also Archuleta v. Avcorp Composite Fabrication, Inc.*, No. CV 18-8106 PSG (FFMx), 2018 U.S. Dist. LEXIS 206495, at *14 (C.D. Cal. Dec. 6, 2018) (Defendant "conservatively estimate[ed] an eight-hour workday"); *see also Wheatley*, 2019 U.S. Dist. LEXIS 26201, at *17.

71. As some putative class members may have been part-time employees, Defendants assume a workday that consists of six hours in order to account for a combination of full- and part-time employees.

72. The applicable average daily wage here is $105.36 ($17.56 per hour x 6 hours per day). *See* Smith Decl., ¶ 25. Thus, if liability was established, each putative Class Member who has separated their employment would be entitled to $3,160.80 ($105.36 x 30 days).

73. Given that there are approximately 2,760 non-exempt employees who separated from their employment for All Banners during the three years prior to the filing of this lawsuit, Smith Decl., ¶ 42, this claim places **$6,542,856.00** in controversy (2,760 x $3,160.80 x .75).

### 6) Failure to Reimburse Business Expenses

74. Plaintiff's ninth cause of action alleges that Sterling failed to indemnify and reimburse Plaintiff and class members for required business expenses in the discharge of their job duties and that it "did not maintain a lawful reimbursement policy." Complaint, ¶¶ 24, 84. The claim is based on Plaintiff's contention that Sterling required non-exempt employees to use their personal cell phones for work purposes without reimbursement. Complaint, ¶ 30(g).

75. California Labor Code Section 2802 requires an employer to "indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties…" California Lab. Code § 2802.

76. This Court has accepted, for purposes of calculating the amount in controversy, an estimate of 50% of employees' cell phone bill costs. *Anderson v. Starbucks Corp.*, No. 3:20-cv-01178-JD, 2020 U.S. Dist. LEXIS 245356, at *12-13 (N.D. Cal. Dec. 31, 2020) (reduction of bill cost by 50% was "reasonable basis for estimating an amount on [*sic*] controversy").

77. Plaintiff has not pled the amount of reimbursement allegedly unpaid, or the cost of her or any putative class member's cell phone bill.  The United States Bureau of Labor Statistics reports that, as of the 2018-2019 years, the mean annual cost of cellular phone service in California was $1,299.07 (approximately $24.98 per week ($1,299.07 divided by 52)).  *See* U.S. Bureau of Labor Statistics, "California: Quintiles of income before taxes, 2017-2018," https://www.bls.gov/cex/2018/research/income-ca.htm (last accessed Apr. 14, 2022).

78. The Court may take judicial notice of this governmental statistic.  *See* Fed. R. Evid. 201(b)(2); *see also Castro v. ABM Indus.*, No. 14-cv-05359-YGR, 2015 U.S. Dist. LEXIS 44887, at *2 n.1 (N.D. Cal. Apr. 2, 2015) (taking judicial notice of similar Bureau of Labor Statistics reports).

79. There were 19,508 biweekly pay periods/wage statements issued to Jared employees since March 4, 2018, or 39,016 workweeks, potentially at issue in this matter.  Smith Decl. ¶ 24.  Assuming that reimbursement was owed for 50% of an employee's weekly cell phone cost ($12.49 per week), the resulting amount in controversy would be **$487,309.84** (39,016 workweeks x $12.49 per week).

### 7)  Attorneys' Fees

80. Plaintiff seeks to recover attorneys' fees.  Complaint at Part (i) of "Prayer for Relief" Section.  Under CAFA, attorneys' fees are included in determining the amount in controversy, regardless of whether they are mandatory or discretionary. *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1155-56 (9th Cir. 1998); *see also Dawsey*, No. 3:15-cv-05188-RBL, 2015 U.S. Dist. LEXIS 93051, at *2-3, 7 (W.D. Wash. Jul. 16, 2015) (calculating both statutory and "reasonable" attorneys' fees to determine the amount in controversy under CAFA).  For class action settlements, the Ninth Circuit has found that 25% of the common fund is a reasonable attorneys' fees award. *See id.* at *7 (citing

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998) ("benchmark" level for reasonable attorneys' fees in class actions in the Ninth Circuit is 25%)).

81. Therefore, "[i]f Defendant can establish by a preponderance of the evidence that the [amount in controversy is] at least $4 million dollars, the addition of twenty-five percent in attorneys' fees would necessarily meet the $5 million amount in controversy requirement under CAFA." *Garcia v. Wal-Mart Stores*, No. 16-01645-BRO (RAO), 2016 U.S. Dist. LEXIS 142807, at *18 (C.D. Cal. Oct. 14, 2016) (citing *Garibay v. Archstone Communities LLC*, 539 Fed. App'x 763, 764 (9th Cir 2013)).

82. Here, as set forth above, there is "substantial, plausible evidence" that the amount in controversy in Plaintiff's second third, fourth, fifth, sixth, eighth, and ninth causes of action in the Complaint totals **$12,436,715.89**. A reasonable estimate of Plaintiff's attorneys' fees is **$3,109,178.97**, which is 25% of the total amount in controversy for these claims. Thus, a conservative calculation of the amount in controversy, based on the allegations in Plaintiff's Complaint addressed herein and the data cited herein, is **$15,545,894.86**. Although this amount does not include all of Plaintiff's claims, it exceeds the $5,000,000.00 threshold required by CAFA. *See* 28 U.S.C. § 1332(d).

83. Although Defendants specifically deny Plaintiff's claims and deny Plaintiff is entitled to recover any of the relief she seeks, it is clear from the allegations in the Complaint and the scope of the relief sought that the amount in controversy exceeds the $5,000,000.00 jurisdictional threshold of 28 U.S.C. § 1332(d).

///

///

///

///

///

///

1

## <u>CONCLUSION</u>

2  84. Based on the foregoing, Defendants respectfully request that the Court remove

3    the above-entitled action to federal court.

4

5   Dated: April 15, 2022           Respectfully submitted,

6                                   /s/*Cory D. Catignani*
                                    Cory D. Catignani
7                                   VORYS SATER SEYMOUR AND PEASE LLP
                                    4675 MacArthur Court
8                                   Suite 700
                                    Newport Beach, CA 92660
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

**STATE OF CALIFORNIA**    )
                          )  **ss.**
**COUNTY OF ORANGE**       )

I, John M. Upton, declare:

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is 4675 MacArthur Court, Suite 700, Newport Beach, CA 92660.

On April 15, 2022, I served the document(s) described as **DEFENDANTS STERLING JEWELERS INC. and SIGNET JEWELERS LTD's NOTICE OF REMOVAL** on all interested parties in said action as stated on the ATTACHED SERVICE LIST by delivery as described below:

☒         **BY EMAIL SERVICE** as follows:  By email or electronic transmission: I sent the document(s) to the person(s) at the email address(es) listed on the service list.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☒         **STATE**    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.  Executed on April 15, 2022, at Newport Beach, California.

                                   _____
                                        John M. Upton

**SERVICE LIST**

*Amy McCormack v. Sterling Jewelers Inc. and Signet Jewelers LTD*

Nicholas J. Ferraro
Lauren N. Vega
Elida M. Espinoza
Ferraro Vega Employment Lawyers, Inc.
3160 Camino de Rio South, Suite 308
San Diego, California 92108
Telephone: (619) 693-7727
Facsimile: (619) 350-6855
nick@ferrrovega.com
lauren@ferrarovega.com

*Attorneys for Plaintiff*