VORYS SATER SEYMOUR AND PEASE LLP
Cory D. Catignani (Bar No. 332551)
cdcatignani@vorys.com
4675 MacArthur Court, Suite 700
Newport Beach, CA 92660
Telephone: (949) 526-7900
Facsimile: (949) 526-7901

Attorneys for Defendants
STERLING JEWELERS INC. and
SIGNET JEWELERS LTD

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMY MCCORMACK, as an individual and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>STERLING JEWELERS INC., a corporation; SIGNET JEWELERS LTD., a corporation; and DOES 1 through 50,<br><br>Defendants. | Case No.  '22CV525 AJB BGS<br><br>**DECLARATION OF REBEKAH SMITH IN SUPPORT OF DEFENDANTS' NOTICE OF REMOVAL**<br><br>Action Filed:  March 4, 2022<br>Trial Date:  None Set<br>Removal Date:  April 15, 2022 |

I, Rebekah A. Smith, being first duly cautioned and sworn and competent to testify about the matters contained herein, hereby declare and state as follows upon personal knowledge and information:

1. I am over eighteen years of age; I am making this declaration based upon my personal knowledge, and my expertise and training; and I am competent to testify to the matters stated below.

2. I, Rebekah Smith, am the Director of Forensic and Dispute Advisory Services and a member of GBQ, a firm specializing in financial consulting services.

3. GBQ was retained by Vorys, Sater, Seymour and Pease LLP ("Vorys"). Vorys is the law firm representing Defendants Signet Jewelers Ltd. ("Signet") and Sterling Jewelers Inc. ("Sterling") in this case.

4. I have over 25 years of relevant business and analytical experience. I am a Certified Public Accountant ("CPA"), Certified in Financial Forensics ("CFF"), a Certified Valuation Analyst ("CVA"), a Master Analyst in Financial Forensics ("MAFF") and a member of the American Institute of Certified Public Accountants, the Ohio Society of Certified Public Accountants and the National Association of Certified Valuators and Analysts ("NACVA"). I earned my Bachelor of Science degree in Accountancy from Bowling Green State University.

5. I lead GBQ's forensic accounting team, which includes our data analytics services. I have training and education related to various financial analysis techniques including data analytics including the analysis of large data sets for purposes of litigation. I teach courses about the same on both on a local and national level. I am a two-time past member and two-time chair of NACVA's Executive Advisory Board ("EAB").[1] I am a past member and chair of NACVA's Litigation and Forensic Board ("LFB").[2] I am a past member and chair of NACVA's Ambassadors' Editorial Board ("AEB").[3] I have also served on NACVA's Course Review Committee, Standards Committee and National Conference Planning Committee. I have included a copy of my curriculum vitae, including testimony experience and publications, as **Exhibit A** to this report.

6. I was asked to review and analyze records in connection with Defendants' Notice of Removal in this case. I received those records directly through an attorney at Vorys.

---

[1] The EAB is NACVA's controlling board which oversees NACVA's four operational boards.
[2] The LFB has the responsibility of evaluating the content of NACVA's litigation and forensics-related curriculum to provide assurance that course content remains objective, technically and fundamentally sound and oversees the credentialing process.
[3] The AEB was formed to act as a think tank on behalf of NACVA.

## SUMMARY AND DESCRIPTION OF DATA

7. I received two data types to analyze:

   a. timekeeping data reflecting hours worked by non-exempt employees working at stores in California (the "Punch Data") for five different banner names: DSC (Design and Service Center), Zale, Jared, Kay and Banter (collectively "All Banner"); and

   b. payroll data containing the number of hours worked by and compensation paid to the same employees (the "Payroll Data"),

8. The Punch Data originated from two timekeeping systems: JDA and Reflexis. The time covered by the data was March 4, 2018 through March 19, 2022. For the purposes of my analysis, I removed any salaried employees.

9. I also received and reviewed Payroll Data for those same employees for the pay period beginning December 3, 2017 and containing all pay periods through March 19, 2022.

## METHODOLOGY

10. The Punch Data was in five (5) files, with one for each Banner, for the period March 4, 2018 through March 19, 2022. The columns were in the same format and therefore, using a Microsoft Excel function called Power Query Editor[4] ("Power Query"), I connected all five (5) files using the common data fields.

11. The Payroll Data was also in five (5) files, with one for each year from 2018 through 2021 and a 2022 file that contained data through March 19, 2022. The payroll data started with the payroll beginning on December 3, 2017 and ended with the payroll ending on March 19, 2022. In 2020, 2021 and 2022 the Payroll Data, the column that indicated the banner was missing from the data set. Therefore, I added this column and determined the banner based on the

---

[4] Power Query Editor is a no-code function that allows a user to connect large data from multiple sources and perform analysis or data transformation.

DECLARATION OF REBEKAH SMITH
3

"Location" column in the Payroll Data. Additionally, I excluded data related to Weisfield because it closed down prior to the March 4, 2018 (the beginning of the analysis period). I also excluded the following locations from my analysis because it is my understanding they are outside the scope of this litigation: Support Center - Akron, OH, Rocksbox San Francisco, CA and Support Center - Irving, TX. After the Payroll Data files were all formatted the same, I used Power Query, and connected all five files using the common data fields.

12. The only other transformation I needed to do to the Payroll Data was to extract the Pay Period Start date and Pay Period End date for the time period March 4, 2018 through March 19, 2022 ("Relevant Period") from a single column containing the Pay Period range to create a master list of pay periods.

13. I was asked to analyze it to make the following determinations:

    a. Total number of pay periods for All Banner California non-exempt team members for the periods March 4, 2018 to March 19, 2022 and March 4, 2021 to March 19, 2022.

    b. Total number of pay periods for all California non-exempt Jared team members for the periods March 4, 2018 to March 19, 2022 and March 4, 2021 to March 19, 2022.

    c. Average hourly rate for all California non-exempt Jared team members for the period March 4, 2018 to March 19, 2022.

    d. Average hourly rate for All Banner California non-exempt team members for the period March 4, 2019 to March 19, 2022.

    e. Total number of workweeks that were overtime eligible for all non-exempt Jared team members for the period March 4, 2018 to March 19, 2022.

    f. Total number of meal eligible shifts (defined below) for All Banner California non-exempt team members for the period March 4, 2018 to March 19, 2022.

    g. Total number of rest period eligible (defined below) for All Banner California non-exempt team members for the period March 4, 2018 to March 19, 2022.

    h. Total number of meal period premiums paid and total number of pay periods (during workweeks with remuneration for work other than just hourly pay) for All Banner California non-exempt team members for the periods March 4, 2018 to March 19, 2022 and March 4, 2021 to March 19, 2022.  As well, the average hourly rate of pay during the same periods.

    i. Total number of sick pay hours paid and total number of corresponding pay periods (during workweeks with remuneration for work other than just hourly pay) for All Banner California non-exempt team members for the periods March 4, 2018 to March 19, 2022 and March 4, 2021 to March 19, 2022.  As well, the average hourly rate of pay during the same periods.

    j. Total number of COVID-19 sick leave hours paid and total number of corresponding pay periods (during workweeks with remuneration for work other than just hourly pay) for All Banner California non-exempt team members for the periods March 4, 2018 to March 19, 2022 and March 4, 2021 to March 19, 2022.  As well, the average hourly rate of pay during the same periods.

    k. Total number of all California non-exempt Jared team members looking back to March 4, 2018 and former team-members looking back to March 4, 2019.

    l. Total number of All Banner California non-exempt team members and former team-members looking back to March 4, 2018 and former team-members looking back to March 4, 2019.

    m. Total the number of All Banner California non-exempt former team-members besides Jared looking back to March 4, 2019 and to March 4, 2021 who had a workweek during that period(s) with Sick Pay, COVID-19 Pay, or a Meal Break Premium and remuneration for work other than regular pay.

14. I was able to use the Punch Data provided to make accurate conclusions on the number and length of shifts. The time keeping data indicated the length of the shift in the data file provided. I tested that to determine the accuracy of the length of shift.

15. I also used the Payroll Data and the specific pay codes for each pay period to identify the weeks where there were meal-period premium pay, sick pay and/or COVID-19 sick pay. Using Power Query, I isolated the pay codes for the specific issue (i.e. meal-period premiums, sick pay etc.) and then using excel logic and analysis identified the weeks that also contained remuneration for work other than regular hourly pay and totaled those weeks.

16. I also used the Payroll Data to determine the average hourly rate and average regular rate of pay for the pay periods in which there were meal period premiums, sick pay and COVID-19 sick pay. I calculated the average hourly rate and average regular rate of pay by using the Power Query function to create queries in the data that identified pay data that fit the criteria of (1) remuneration for work other than hourly pay and (2)the specific pay code such as meal or sick, etc. and then calculated based on the below.

17. To calculate average hourly rates, I identified any lines where the pay code was "Regular Hourly" in the specified date range and totaled the wage amount and the hours worked, then divided to determine the weighted average hourly rate.

18. For purposes of my analysis, an overtime-eligible week is defined as any week where an employee worked more than 40 hours, worked a single shift of more than 8 hours, or worked for seven consecutive days within the same week.

19. To make the determination of the number of overtime-eligible weeks, I used standard processes for analyzing large amounts of wage-and-hour data to identify the number of weeks where an employee worked more than 40 hours, the number of shifts where the employee worked over 8 hours, and the number of times an employee worked 7 consecutive days within the same week.

20. For purposes of my analysis, a meal-period-eligible shift is defined as an individual shift of over 5 hours. For purposes of my analysis, a rest period eligible shift is defined as an individual shift of at least 3.5 hours.

21. To make the determination of the number of meal period and rest period eligible shifts, I used standard processes for analyzing large amounts of wage-and-hour data to identify the number of shifts where an employee worked over five hours in a shift and/or 3.5 or more hours in a shift.

## DATA ANALYSIS

**Total Pay Periods**

22. The pay periods in the Payroll Data are two-week periods beginning on Sunday and ending on Saturday. Using the Payroll Data, I analyzed the Period Start Dates and Period End Dates to determine that the first pay period that includes the start of the Relevant Period, begins on Sunday, February 25, 2018. From there I was able to determine the remainder of the pay periods.

23. Using the methodologies described above, the total number of pay periods for All Banner California non-exempt team members for the periods below are:

    a. March 4, 2018 to March 19, 2022 – 146,305

    b. March 4, 2021 to March 19, 2022 – 37,671

24. Using the methodologies described above, the total number of pay periods for all California non-exempt team members for Jared for the periods below are:

    a. March 4, 2018 to March 19, 2022 – 19,508

    b. March 4, 2021 to March 19, 2022 – 4,250

**Average Hourly Rate**

25. Using the methodology described above, I used the Payroll Data to calculate the average hourly rate for all California non-exempt Jared team members for the period March 4, 2018 to March 19, 2022 to be equal to $17.56.

26. In addition, I used the Payroll Data to calculate the average hourly rate for All Banner California non-exempt team members for the period March 4, 2019 to March 19, 2022 to be equal to $18.77.

**Overtime**

27. Using the Punch Data, I totaled the amount of time worked by each non-exempt California Jared employee during each shift during to determine if an employee had worked 8 hours a day. I also determined, based on the previously described work week determination, any work weeks that exceeded 40 hours. Finally, I analyzed the Punch Data to identify any instances where an employee worked seven (7) consecutive dates measured from Sunday to Saturday.

28. A work week was counted as overtime eligible if any of the three above circumstances were present.

29. Using the methodologies described above, I determined that the number of work weeks that were overtime eligible during the Relevant Period for non-exempt California Jared employees was 25,913.

**Meal Periods**

30. Using the Punch Data, I totaled the amount of time worked by each Jared team member during each shift during the Relevant Period and limited the list of shifts to only those that were over five hours. The number of shifts over 5

hours for the period March 4, 2018 to March 19, 2022 for non-exempt California Jared team members was 140,877.

31. Using the Payroll Data, I totaled the number of meal period premiums paid and total number of corresponding pay periods during work weeks with remuneration for work other than just regular hourly pay for All Banner California non-exempt team members as follows:

    a. Meal period premiums paid during work weeks with other remuneration for work:
        i. March 4, 2018 to March 19, 2022 – 38,839
        ii. March 4, 2021 to March 19, 2022. – 14,931
    b. Pay periods with meal period premiums paid during work weeks with other remuneration for work:
        i. March 4, 2018 to March 19, 2022 – 32,594
        ii. March 4, 2021 to March 19, 2022 – 10,289

32. Employing the methodologies described above for determining the average hourly rate, I used the Payroll Data to determine the average hourly rate of pay for shifts of over 5 hours was as follows:

    a. March 4, 2018 to March 19, 2022
        i. Average hourly rate - $19.57
    b. March 4, 2021 to March 19, 2022
        ii. Average hourly rate - $21.93

**Rest Periods**

33. Employing the methodologies described above, I used the Punch Data to determine that the number of shifts of at least 3.5 hours for non-exempt California Jared team members during the Relevant Period was 152,081.

**Sick Pay**

34. Using the Payroll Data, I totaled the number of sick pay hours paid and total number of corresponding pay periods during work weeks with

remuneration for work other than hourly pay for All Banner California non-exempt team members as follows:

    a. Sick hours paid during work weeks with other remuneration for work:
        i. March 4, 2018 to March 19, 2022 – 124,223
        ii. March 4, 2021 to March 19, 2022. – 36,312
    b. Pay periods with sick hours during work weeks with other remuneration for work:
        i. March 4, 2018 to March 19, 2022 – 11,877
        ii. March 4, 2021 to March 19, 2022. – 3,345

35. Employing the methodologies described above for determining the average hourly rate, I used the Payroll Data to determine the average hourly rate of pay during the same periods:

    a. March 4, 2018 to March 19, 2022
        i. Average hourly rate - $18.74
    b. March 4, 2021 to March 19, 2022
        ii. Average hourly rate - $20.93

**COVID-19 Pay**

36. Using the Payroll Data, I totaled the number of COVID-19 sick leave hours paid and total number of pay periods during work weeks with remuneration for work other that hourly pay for All Banner California non-exempt team members as follows:

    a. COVID-19 sick leave hours during work weeks with other remuneration:
        i. March 4, 2018 to March 19, 2022 – 13,424
        ii. March 4, 2021 to March 19, 2022. – 8,110
    b. Pay periods with COVID-19 sick leave during work weeks with other remuneration:
        i. March 4, 2018 to March 19, 2022 – 619

    ii. March 4, 2021 to March 19, 2022. – 501

37. Employing the methodologies described above for determining the average hourly rate, I used the Payroll Data to determine the average hourly rate of pay during the same periods:

  a. March 4, 2018 to March 19, 2022

    i. Average hourly rate - $20.59

  b. March 4, 2021 to March 19, 2022

    ii. Average hourly rate - $20.82

**Employee Information**

38. Using the Payroll Data, I totaled the number of all non-exempt Jared team members during the Relevant Period, which was equal to 758 employees.

39. Using the same Payroll Data and based on the field that indicated if an employee was active or inactive, I totaled the number of former non-exempt California Jared team-members (using the "inactive" code) looking back to March 4, 2019 which was equal to 407 employees.

40. Using same the Payroll Data, I totaled the number of All Banner California non-exempt team members looking back to March 4, 2018, which was equal to 5,240 employees.

41. Using the same Payroll Data, I totaled the number of All Banner California non-exempt team members looking back to March 4, 2021, which was equal to 2,499 employees.

42. Using the same Payroll Data and based on the field that indicated if an employee was active or inactive, I totaled the number of All Banner California non-exempt former team-members (using the "inactive" code) looking back to March 4, 2019 which was equal to 2,760 employees.

43. Using the same Payroll Data and based on the field that indicated if an employee was active or inactive, I totaled the number of All Banner California non-exempt former team-members besides Jared looking back to

two periods (as listed below) who had a work week during that time with Sick Pay, COVID-19 Pay, or a Meal Break Premium and remuneration for work other than regular pay, as follows:

    a. Back to March 4, 2019 – 1,928

    b. Back to March 4, 2021 - 443

I declare under penalty of perjury that the foregoing is true and correct.

Executed April 14, 2022 at _____GBQ Consulting LLC, Columbus, Ohio_____.

_____
REBEKAH SMITH